[713 NYS2d 29]

In the Matter of Eastern Minerals International, Inc., Respondent, v Cane Tennessee, Inc., Appellant.

First Department, August 31, 2000

## APPEARANCES OF COUNSEL

*Raymond D. Battocchi* of counsel (*John H. Doyle, III, Jordan W. Siev* and *Vicki A. Paisley* on the brief; *Anderson Kill & Olick, P. C.,* and *Gabeler, Battocchi & Griggs, L. L. C.,* attorneys), for respondent.

*Edwin B. Mishkin* of counsel (*Jacqueline Jones-Peace* on the brief; *Cleary, Gottlieb, Steen & Hamilton,* attorneys), for appellant.

## OPINION OF THE COURT

Tom, J. P.

Respondent-appellant Cane Tennessee is owner and landlord of property in the State of Tennessee that contains coal and mineral deposits. Petitioner-respondent Eastern Minerals International, Inc. is tenant of the property under a lease dated February 16, 1979. The lease provided, among other things, for the leased land to be used for coal mining. Rent was calculated at the greater amount of either a minimal annual rent reflecting a specified portion of the landlord's investment, or 3.5% of the lease year's revenues. The basic term ran from 1979 to 1991, with a proviso for a maximum of four ten-year extensions, unless the lease terminated sooner under the terms therein.

The lease by its terms would terminate upon a "total taking" (§ 18 [b]). Taking was described in the definitional section of

264

the lease (§ 1) as "a taking of all or part of the *land* or *any interest therein or right thereto*, as a result of the exercise of the right of *condemnation or eminent domain*" commencing on the date that the tenant should "lose the right of possession" (italics added).

If a taking occurred, the lease also governed the economic consequences as between the tenant and the landlord: "the award or payment on account of such Taking * * * shall be applied to payment of the parties' reasonable costs of collecting such award and the balance (the 'net award') shall be apportioned between the parties in accordance with their respective interests in the land, provided that in no event shall Tenant receive any portion of the net award until Landlord shall have received an amount which shall at least equal Landlord's investment." Basically, the Landlord was ensuring its recovery, first, of its investment costs, with the remainder to be apportioned. This clause continued: "[i]f the net award exceeds Landlord's investment and the parties are unable to agree on the *apportionment* of the net award between them, *such dispute* shall be submitted to arbitration" (italics added). One issue raised in the present appeal is whether this language requires arbitration of the preliminary question whether there has been a taking, triggering section 18 (b) of the lease, or whether only the particular apportionment of the compensation award is to be arbitrated.

A separate clause (§ 30) requires that arbitration required by the lease would be conducted in New York City, in accordance with the law of the State of New York. The lease otherwise would be governed by Tennessee law (§ 39).

The tenant took possession under the lease and made preparations to mine coal, which required permits from Tennessee and, after 1984, from the Federal Government. The tenant received one-year permits in 1980 and 1981, but thereafter did not receive final agency action on permit applications prior to the 1990 expiration of the original lease, the applications being finally denied in 1994. As a result, the tenant never mined any coal—the very purpose of the lease and the extent of its possessory interest in the land. By 1993, landlord and tenant stipulated that the lease was terminated in accordance with its terms. As a result, the tenant commenced an action against the United States claiming inverse condemnation (*Eastern Mins. Intl. v United States [Eastern I]*, 36 Ct Fed Cl 541, 544-545, 549-550; *Eastern Mins. Intl. v United States [Eastern II]*, 39 Ct Fed Cl 621, 623-625), in which it eventually prevailed at

the District Court level, which awarded the tenant $9,961,393. Although originally invited in 1994 by the tenant to participate in this action, the landlord declined. However, the landlord subsequently moved to intervene, which motion was denied (*Eastern Mins. Intl. v United States [Eastern III]*, 168 F3d 1322). The landlord thereafter commenced its own inverse condemnation action (*Cane Tennessee v United States*, No. 96-237L), in which the landlord has recently survived a motion for summary judgment as to its own takings claim (44 Ct Fed Cl 785), though it was unsuccessful in its attempt to consolidate its case with the tenant's action (*Eastern III*). The tenant's recovery has been stayed pending the Government's appeal to the United States Court of Appeals.

In June 1999, the landlord served and filed a demand for arbitration seeking $5,106,630 as its portion of the tenant's condemnation award. The tenant then commenced the present action to permanently stay arbitration (CPLR 7503 [b]). The basic thrust of the tenant's argument is that there was no taking as that term is defined in the lease (i.e., "condemnation or eminent domain"), notwithstanding a Federal court judgment recognizing that a regulatory taking had occurred for Fifth Amendment purposes. As such, in the tenant's view, there is no arbitrable dispute. The motion court, in staying arbitration, adopted the distinction between a regulatory taking and a taking under the lease as was urged by the tenant.

We read this as too narrow a construction placed on the lease term "taking." We find no support in the lease for that construction and we instead accord the term its commonly accepted meaning dating back to the landmark *Penn Central* ruling (*Penn Cent. Transp. Co. v City of New York*, 438 US 104) and subsequent case law (*see, e.g., Eastern Enters. v Apfel*, 524 US 498). Accordingly, we reverse and vacate the stay.

Although the broader context of this case involves the law that has developed under the Fifth Amendment in connection with the Government's regulatory taking of private possessory interests in property, the issue before us is resolved by standard canons of contract interpretation. The parties presently dispute the weight to be accorded "condemnation" and "eminent domain" under section 1 of the subject lease in determining whether a taking occurred as defined by the lease, as well as whether a taking under the lease must be equated with a physical dispossession, or may result from a substantial abridgement of possessory rights. For purposes of terminating the lease, a "total taking" was construed in section 18 (b) to also

include the taking of "a substantial portion of the *land* which shall be sufficient to render the *remaining portion unsuitable for tenant's uses* [as specified in the lease]" (italics added).

Initially, we disagree with the landlord that the Federal Arbitration Act governs this dispute. Parties are free to agree to the arbitration forum and the choice of law applicable to the arbitration proceeding (*Volt Information Sciences v Board of Trustees*, 489 US 468, 476-479), as was explicitly done in this present lease. New York law applies to the present dispute. The next question regards the scope of the arbitration. If parties have agreed to submit only particular issues to arbitration, "the rule is clear that unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the particular dispute, a party cannot be compelled to forego the right to seek judicial relief and instead submit to arbitration" (*Bowmer v Bowmer*, 50 NY2d 288, 293-294, citing *Gangel v DeGroot*, 41 NY2d 840, 841). Moreover, "an arbitration clause must be read conservatively if it is subject to an equivocal reading" (*id.*, at 841; *see also, Trump [Refco Props.]*, 194 AD2d 70, .74, *lv denied* 83 NY2d 754). Hence, the principle of scrupulous reading of arbitration clauses is well established, in furtherance of which we extend the waiver of judicial redress encompassed in an arbitration clause no further than is actually agreed upon. The manner in which section 18 (b) of the lease is structured and its plain language makes clear that only disputes over the mathematical apportionment of the parties' respective rights in the net condemnation award were intended to be arbitrated, and not the preliminary question whether the nature of the award triggered section 18 (b). This latter question, rather, turns on the construction to be accorded the term "taking" in the lease, which is left for judicial resolution.

The tenant does not, and indeed cannot, contend that no taking has occurred. It has commenced, and has thus far even prevailed in, a Federal court action seeking that very declaration. Tenant, rather, argues that "taking" in the lease is necessarily defined in terms of a physical taking. The tenant relies for this proposition on *United States v Clarke* (445 US 253), a 1980 case applying a 1901 Federal statute (25 USC § 357) that, indeed, equated the term "condemned" with a judicial proceeding commenced to acquire title. However, leaving aside that our task is to examine what is meant by the terms of this lease rather than a particular, limited, meaning of a century-old statute, the constitutional law of takings has developed

substantially in the last two decades (*see*, Robinson, Environmental Regulation of Real Property § 3.04 ["Regulatory Takings"] [American Law Media]). The result is that courts now recognize a significant overlap between regulatory takings, in which possessory rights of use but not title are affected, and physical takings, in which the property is physically invaded and/or acquired as the result of eminent domain proceedings. As was remarked by Justice Brennan in *San Diego Gas & Elec. Co. v San Diego* (450 US 621, 653 [dissenting opn]), "government action other than acquisition of title, occupancy, or physical invasion can be a 'taking,' and therefore a de facto exercise of the power of eminent domain." Hence, although "condemnation" and "eminent domain" are loosely used as definitional criteria, though nowhere defined in the lease, under modern constitutional use, the reference is to the need to compensate the owner when either ownership or use is substantially impugned. The contract does not support any narrower construction.

Finally on this point, by trying to further equate "taking" under the lease with a physical dispossession from "the land" by reference to section 1, the tenant ignores the substantial interference with possessory *rights* contemplated in that same definition, which is underscored by the very definition of "land" in section 1 as encompassing rights and privileges to be enjoyed by the possessory party. The tenant's argument also overlooks the correlation between a taking and the tenant's deprivation of use in section 18 (b). Hence, the tenant's tortured semantics are untenable given the terms of the lease.

■ The tenant contends that, alternatively, the present action is not yet ripe for arbitration, in that further judicial review in Federal court may modify or even eliminate the award, especially in view of the tenant's pending action to recover attorneys' fees from the United States. On the latter point, insofar as the landlord is not a party to the tenant's attorneys' fees proceedings and such fees are not a directly recoverable amount under the lease, the status of that proceeding is simply irrelevant to the present proceeding. Moreover, all matters pertaining to the apportionment of the award are the very items that the arbitration agreement was devised to address. Hence, to whatever extent the award is judicially altered would be a factor properly considered by the arbitration panel. In any event, should the landlord prevail in arbitration, the arbitrators probably will establish a mathematical formula that would not depend on any particular amount set by the final award, so that in this sense, too, arbitration would not be premature.

We have considered, and rejected, the tenant's remaining contentions.

Accordingly, the judgment of the Supreme Court, New York County (Louis York, J.), entered January 25, 2000, granting the petition to permanently stay arbitration, should be reversed, on the law, without costs, the petition denied and the stay proceeding dismissed.

MAZZARELLI, LERNER and BUCKLEY, JJ., concur.

Judgment, Supreme Court, New York County, entered January 25, 2000, reversed, on the law, without costs, petition denied and the proceeding dismissed.